IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2009

## STATE OF TENNESSEE v. RICKEY DICKERSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-02309     John T. Fowlkes, Jr., Judge**

---

**No. W2008-00301-CCA-R3-CD  - Filed May 4, 2009**

---

The defendant, Rickey Dickerson, was convicted by a Shelby County Criminal Court jury of two counts of second degree murder and sentenced to concurrent terms of twenty-two years as a Range I offender.  On appeal, he challenges the trial court's admission of photographs of one of the victims, the trial court's giving a jury instruction on criminal responsibility, and the sufficiency of the convicting evidence.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Eric Christensen, Memphis, Tennessee, for the appellant, Rickey Dickerson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tracye N. Jones and Damon K. Griffin, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

This case arises out of an October 2003 shooting at RC's Place, a nightclub, in Memphis. For their involvement, the defendant and a co-defendant, Jermaine Harris,[1] were indicted for the second degree murders of Samuel White and Carlmarlos White.[2]

**State's Proof**

---

[1] This appeal involves only the defendant.

[2] Because the victims have the same last name, we refer to them by first name only as necessary.

Mary White, the victims' mother, testified that Samuel was nineteen years old at the time of his death and had a young daughter. Carlmarlos was thirty-one years old and had a one-year-old daughter at the time of his death. Ms. White identified a photograph of Samuel taken when he graduated from high school in 2002, as well as a photograph of Carlmarlos taken "some months before he was murdered." Ms. White saw both of her sons for the last time on October 22, 2003; the day before they were murdered.

Dr. Teresa Campbell, a medical examiner at the time of the victims' deaths, was accepted as an expert in forensic pathology and testified that she performed the autopsies of the victims on October 23, 2003. Dr. Campbell determined that Samuel's cause of death was "near gunshot wound to chest, a homicide." She noted there was stippling around the gunshot wound, meaning the gun was fired from an approximate distance of two feet. At the time of the autopsy, Samuel had a blood alcohol level of 0.136 and tested negative for drugs. Dr. Campbell testified that Carlmarlos survived approximately four or five hours after he was shot, but eventually died because the bullet perforated his blood vessels causing him to bleed copiously. Dr. Campbell determined that Carlmarlos' cause of death was "near gunshot wound involving chest and abdomen, homicide." She noted there was also stippling around Carlmarlos' gunshot wound. Dr. Campbell explained that because Carlmarlos received a number of blood transfusions, she had a vitreous fluid sample drawn as well as a blood sample. Carlmarlos' blood alcohol level returned as 0.057, and his vitreous fluid specimen indicated an alcohol content of 0.1 four or five hours after the shooting. Dr. Campbell noted that the legal intoxication limit in Tennessee was 0.08. She observed that both Samuel and Carlmarlos had abrasions that were possibly consistent with them having been in an altercation.

Agent Robert Royse, forensic scientist with the Tennessee Bureau of Investigation, was accepted by the court as an expert in the area of firearms identification. As part of his duties, Agent Royse analyzed the bullets submitted to him by the medical examiner's office that were retrieved during the victims' autopsies. He determined that both bullets were "three-eighty auto caliber" and had been fired from the same gun.

Melvin Wordlaw testified that he was employed at RC's Place in October 2003 and typically worked security. Although he was not working the night of October 23, 2003, he was at the club having some drinks. He stated that the victims were at the club that night and recalled that he talked to Carlmarlos for approximately twenty minutes regarding security work. Wordlaw remembered that Carlmarlos was drinking and thought that Samuel "probably had a beer or something."

Wordlaw testified that after the victims had been at the club for about an hour, he saw Samuel at the bar and observed two men walk up to the bar and order a drink. Wordlaw heard Samuel "wolf talking" with one of the men, who had short hair, about a tongue ring. Wordlaw explained that "wolf talking" is "[w]hen guys just be talking . . . criticizing one another." Carlmarlos approached and hit the man with short hair, and a fight broke out involving several people in the club. The man with short hair fell down under some tables, and Carlmarlos and Samuel both "tried to jump on him." Wordlaw was able to separate the men, and he kept the victims inside and had the

other two men, the man with short hair and a man with dreadlocks, escorted out the front entrance.

Wordlaw recalled that Samuel exited the club from the side door, and he and the man with the short hair started to fight again in the street in front of the club. Soon after, Carlmarlos went outside and got involved in the fight. From where he stood near the side door, Wordlaw saw a man with dreadlocks approach the fight from the other side of the club with a gun, heard a shot, and saw that Samuel "was shot and down." However, Wordlaw acknowledged on cross-examination that from his vantage point at the side door, he was not sure where the man with dreadlocks came from prior to seeing him in the street. Wordlaw yelled for someone to call 911 and went to check on Samuel to find that he had been shot in the chest. Wordlaw did not see Carlmarlos after Samuel was shot and noted that the man with short hair and the man with dreadlocks ran out of sight in the direction of the back of the club. Wordlaw testified that it was dark outside when the shooting occurred, but he noted there was a street light at the side of the club as well as one across the street. On redirect examination, Wordlaw recalled that the man with dreadlocks was by the light pole when he saw him with the gun and heard the first shot.

A few days after the incident, police officers showed Wordlaw a photographic array from which he identified "the person . . . from that night with the dreads" who fired the shot at Samuel and in court identified the defendant as the gunman. On cross-examination, Wordlaw stated that "[i]t could be possible" there was another man with dreadlocks outside the club that night, and he acknowledged that given the confusion of the incident, it was possible someone other than the defendant shot Samuel. He admitted that he did not see a gun being fired; he only heard the shots. On redirect examination, Wordlaw recalled that he heard three shots that night. He also testified that he was positive about the identification he made from the photographic array soon after the shooting. He stated that he did not see anyone else with a gun that night other than the man he identified in the array.

Edward Luckett testified that he was working at the bar at RC's Place the night of October 23, 2003. Luckett stated that the victims, who were his in-laws, went with him to the club that night. He said that neither victim had a weapon. While Luckett was working, two men came to the bar, and one of them, a man with "a low haircut" identified as the co-defendant, asked to buy a cigar. The co-defendant refused to pay the one-dollar purchase price for the cigar and then approached Samuel "just talking about his tongue ring, why he had a tongue ring and all that." Luckett recalled that Carlmarlos, who was sitting at the end of the bar, heard Samuel and the co-defendant arguing and went over to see what was going on between the two. The co-defendant "had words" with Carlmarlos and a fight broke out.

Luckett recalled that security escorted the co-defendant and the other man with him out of the club, while he, Samuel, and Carlmarlos remained inside. At some point, however, Samuel made his way outside and started to fight with the co-defendant. Carlmarlos went outside to check on Samuel, and Carlmarlos asked Luckett to go inside and look for his car keys because he could not find them and was getting ready to leave. While he was inside looking for the keys, Luckett heard two gunshots. He ran outside after he heard the shots and saw Samuel's body in the street and a man

with dreadlocks, identified as the defendant, standing on the curb near Samuel's body with a gun in his hand. On cross-examination, he acknowledged that he never actually saw anyone discharge a weapon.

Luckett testified that he saw the defendant run away and then heard more shots. Luckett and others looked for Carlmarlos and found him collapsed behind the club. A few days after the incident, Luckett went to the police station and viewed two photographic arrays from which he identified both the defendant and co-defendant. Luckett said that "it was bright out" because of nearby street lights when he went outside after hearing the gunshots.

Montrella Hassell testified that he was employed at RC's Place in October 2003, and although he was not working on the night of October 23, he was at the club and remembered seeing Samuel and Carlmarlos. Hassell recalled that at some point during the night, a fight broke out between Samuel and Carlmarlos and two other men. Hassell stated that this night was the first time he had seen any of the four men at the club. Hassell saw Samuel fighting with one of the men, "a tall, slim guy," near the pool table and saw Carlmarlos being held back by security from his fight with the other man. Hassell recalled that the fight was broken up, and Samuel and Carlmarlos remained inside because they had arrived with an employee, while the other two men were escorted out the front door.

Hassell testified that he saw Samuel, who appeared to be very angry, leave from the side door and run toward the front of the club. Hassell watched through a crack in the door as the "tall, slim guy" with dreadlocks pulled a gun out from under his shirt and shot Samuel. The taller man walked toward Samuel as if to shoot him again, and "the short, stocky guy" with short hair pushed him and encouraged him to leave. The "tall, skinny guy" fell and dropped the gun, the heavier man picked the gun up, and the two ran away. Hassell recalled that as the two men were running away, Carlmarlos walked out the club door, saw Samuel lying on the ground, and ran after the two men. Hassell noted that there were a number of lights around the outside of the club. Hassell said that he did not see either Samuel or Carlmarlos with a gun that night.

On cross-examination, Hassell testified that he told the police after the shooting that the gunman had dreadlocks and that his written statement was incorrect if it said "braids or dreads." He acknowledged that he did not mention in his statement anything about the heavier man picking up the gun. He admitted that some things were not as fresh in his mind as they were right after the incident. Hassell conceded that he was unable to identify anyone from the photographic arrays shown to him by police or identify anyone in court. On redirect examination, Hassell said that he was positive about the events he described in his testimony but acknowledged on recross examination that he may have forgotten things.

Jesse Burnside testified that he was managing the night crew at RC's Place on October 23, 2003, when he was informed about an altercation at the bar, but security had already broken up the fight when he went to investigate. He recalled that two brothers and two other men were involved in the fight, and he had the two other men escorted out of the club to keep the fight separated. He

chose to kick out the other men instead of the brothers because they had gotten into an argument with a woman earlier that night. He never saw any of the four men with a gun that night.

Burnside testified that after the men were escorted out of the club, one of the brothers went outside and, within a few minutes, he heard shots fired. Burnside elaborated that only one of the brothers was outside when he heard one or two shots and then saw the "bigger" brother exit the club. He did not see anything that happened outside the club. After the incident, Burnside viewed photographic arrays from which he identified the defendant and co-defendant as the men who had been fighting with the victims. He identified both men in court as well.

Officer Patrick Jones with the Memphis Police Department testified that he responded to a shots fired call at RC's Place on October 23, 2003. At the scene, Officer Jones found "a male victim laying in the right lane of the westbound Lamar traffic" and another victim behind the building on the north side. Officer Jones estimated that it was shortly after midnight when he responded to the scene. He said that even though it was dark outside, the scene was well lit by nearby street lights.

Officer Michael Hill with the Crime Scene Investigation Unit of the Memphis Police Department testified that he responded to a homicide scene outside of RC's Place on Lamar Avenue on October 23, 2003. He noted that there was a body in the street in front of the club when he arrived. Officer Hill recovered several spent 40-caliber and 380-caliber shell casings that were "[s]cattered all about," as well as a broken key, a set of keys, a yellow headband with what appeared to be blood on it, and a nightstick. Officer Hill described the lighting in a photograph of the crime scene as "dark."

Lieutenant Mark Miller with the Homicide Bureau of the Memphis Police Department testified that he was the case coordinator for the homicide investigation in this case. Based upon their investigation, the defendant and co-defendant were developed as suspects. Lieutenant Miller and Sergeant Berryman interviewed the co-defendant four days after the incident. Lieutenant Miller recalled that the co-defendant told him that he and the defendant had gotten into a fight at the club, the fight continued outside, and "he shot the big person, as he put it, one of the brothers." The co-defendant said that he shot the "big guy" because he was "beating his ass." Lieutenant Miller stated that the co-defendant also told him another version of what happened – that "at some point in time that he fell down and that the gun went off." Lieutenant Miller said that the co-defendant's statement was not reduced to writing because when asked if he would be willing to do that, the co-defendant requested an attorney and the interview ended. On cross-examination, Lieutenant Miller acknowledged that the interview did not take place until several hours after the co-defendant was taken into custody. Lieutenant Miller noted that the co-defendant relayed that he lost a tooth and sustained injuries to his shoulder, back, and head as a result of the fight at the club that night. However, Lieutenant Miller did not notice any injury to the co-defendant's head.

**Defendant's Proof**

Latasha Harwell testified that she was at RC's Place on October 23, 2003, and saw the fight involving the defendant, the co-defendant, and the two victims. Harwell remembered the co-defendant because he had tried to talk to her at the bar earlier that night. When she refused his advances, the co-defendant, who had been drinking, told Harwell, "You ain't all that," called her a name, and blew smoke in her face. Harwell became upset and prepared to defend herself, but the bartender "split it up."

Approximately an hour after Harwell's altercation with the co-defendant, the fight broke out between the defendant and co-defendant and the two victims, and the defendant and co-defendant were escorted out the front door of the club and the victims remained inside. Samuel "tussled to get out" the side door of the club, and Harwell and two other women went out to try to get him to go back inside. Samuel got into a "tussle" with the co-defendant outside near the front door, and a man broke up the fight. Harwell testified that she was trying to get Samuel to go back inside when the co-defendant, who had walked off, returned and pulled a gun. She said the defendant "wasn't far behind him." At the sight of the gun, Harwell turned to run back inside the club, and she heard the first gunshot as she got in the door and more gunshots after she was inside. She said that "[e]verything happened so fast."

Harwell viewed a photographic array a few days after the incident from which she identified the co-defendant as the man she saw with a gun prior to her turning to run back inside the club. She acknowledged that she did not actually see the co-defendant fire the gun. Harwell also identified the defendant as being involved in the incidents inside and outside of the club but said she did not see him with a gun. After reviewing her statement to police, Harwell testified that the co-defendant was wearing a yellow headband the night of the incident.

Latoya Williams testified that she was at RC's Place on October 23, 2003, and recalled a confrontation between the victims and two other men. She said that the men exchanged words and "tussl[ed]" with each other. Samuel and one of the other men went out the side door of the club, and Williams followed them to try to prevent Samuel from getting involved in an altercation. She saw a "short, kind of stocky [man], [with] a low haircut, [and] dark skin" approach Samuel and pull out a small gun. She could not see the entire gun but "saw the backfire when he first . . . shot." Williams saw Samuel lying on the ground and heard him yelling that he was cold. Samuel then started having convulsions, and blood came out of his ears. She said she did not see Samuel or Carlmarlos with a gun or weapon. She noted that the area where the incident took place was well-lit. Williams admitted that her memory was a "little fuzzy" about some of the incident.

Williams acknowledged that she told the police after the incident that she did not see the weapon, but she heard gunshots. She also acknowledged that she told the police in her statement that her view of the gunman was obscured by Samuel because she was standing behind him. However, Williams explained that she later remembered some details. She recalled that she identified a man with dreadlocks and a scar on his forehead from a photographic array as being at the club that night, but she did not see him with a gun.

-6-

The defendant testified that on October 23, 2003, he and the co-defendant were at RC's Place "[h]aving a couple of drinks and kicking it" when a fight broke out between the co-defendant and two brothers. The defendant tried to restrain the co-defendant, but the fight escalated and he and the co-defendant were told to leave the club. The defendant left through the front door of the club and tried to locate the co-defendant outside. The defendant found the co-defendant just as the two brothers from the fight inside found the co-defendant, and a second fight started. The defendant stepped in to break up the fight and then "wandered off into the crowd." As he was walking back to the car, the defendant realized that the co-defendant was not with him and then heard a gunshot. The defendant walked back toward the club and saw a body lying in the street and the co-defendant being helped to his feet. The defendant asked the co-defendant what had happened, but the co-defendant was not acting like himself so the defendant left with a couple he knew from his neighborhood.

The defendant denied shooting anyone that night or that he had a gun and said that any witness who testified differently was mistaken. The defendant stated he did not know that Carlmarlos had also been shot and did not see either of the victims with a gun that night. The defendant said it was dark outside on the street but acknowledged there were street lights in the vicinity.

### Co-Defendant's Proof

Nakisha Davis testified that she received a call from the co-defendant around 4:00 a.m. on October 23, 2003, asking her to pick him up "on the side of RC's [Place]." When she arrived, she found the co-defendant "pretty much unconscious, kind of in and out," and when she asked him questions, he would "fade away" and was "not comprehending too good." He told her that he "got jumped by two male blacks." She noted that the co-defendant had scratches and bruises on his back, his tooth was missing, and he had a "big gash" on the right side of his head. Davis stated that she had known the co-defendant for over six years and had never known him to start a fight or be aggressive. Davis acknowledged that she did not personally witness anything that happened at the club.

Following the conclusion of the proof, the jury convicted the defendant of two counts of second degree murder,[3] and the trial court sentenced him to concurrent terms of twenty-two years. The defendant appealed.

## ANALYSIS

### I. Admission of Photographs

---

[3] The jury convicted the co-defendant of reckless homicide as to Samuel White and voluntary manslaughter as to Carlmarlos White. Again, this appeal does not involve the co-defendant.

The defendant argues that the trial court erred in admitting a graduation photograph of Samuel White into evidence, arguing that the photograph was unfairly prejudicial in that it was likely to elicit sympathy from the jury. The defendant also argues that the trial court erred in admitting a post-mortem photograph of Samuel White's face because such photograph was not necessary to establish identity and "only served to inflame the jury because of its haunting nature." The State responds that the trial court did not abuse its discretion in admitting the photographs because "there is nothing inherently prejudicial about them."

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused its discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Tenn. R. Evid. 403.

At the start of trial, the defendant objected to the State's introduction of a photograph showing Samuel White in his graduation cap and gown, holding a diploma. He argued that the photograph would elicit sympathy from the jury and cause him prejudice. The State argued that it was a recent photograph taken relatively close in time to his death. The court found that the photograph's probative value of showing the victim fairly close in time to when the events took place outweighed any prejudice caused "[j]ust because he has the cap and gown on."

Later in trial, during the medical examiner's testimony, the defendant objected to the State's introduction of a post-mortem photograph of Samuel White showing his eyes and mouth open, "something wrong with his tongue," and blood on his teeth, arguing it was "entirely prejudicial." He also argued that the photograph had no probative value because "the jury knows who we're talking about," and photographs of Samuel's entry and exit wounds had already been entered into evidence. The State argued that it was the best photograph of those taken by the medical examiner and was necessary to establish the victim's identity "because the medical examiner doesn't know him from anybody else." The court ruled, "Because of the fact that it goes to identify a victim to this witness, I'm going to allow it into evidence. . . . I just don't feel that -- if there is any prejudicial effect, I don't feel that that effect outweighs the probative value of the picture."

As to the photograph of Samuel taken while alive, we conclude that the trial court did not abuse its discretion in admitting it into evidence. The defendant does not dispute the photograph's relevance or probative value of proving the identity of the victim. He only asserts that the State should have been required to enter a less prejudicial photograph. The record indicates that this was likely the most recent photograph of Samuel. Given that our supreme court has upheld the admission of a family photograph of a victim and her children, State v. Nesbit, 978 S.W.2d 872, 901-02 (Tenn. 1998) (Appendix), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359 (1999), and a portrait-style

photograph of a victim, State v. Cole, 155 S.W.3d 885, 911-912 (Tenn. 2005) (Appendix), cert. denied, 546 U.S. 829, 126 S. Ct. 47 (2005), among other things, we discern no error in the trial court's ruling that the probative value of the photograph outweighed any prejudice. We have also reviewed the post-mortem photograph in question and although it is naturally unpleasant, it is not particularly gruesome or horrifying. We conclude that any prejudicial effect does not substantially outweigh its probity. In any event, even if the court erred in admitting this photograph, "it does not affirmatively appear that the error in admission of the photograph[] has affected the results of the trial." See Banks, 564 S.W.2d at 953.

## II. Jury Instruction

The defendant next argues that the trial court erred in giving a jury instruction on criminal responsibility for the conduct of another because there was "no underlying felony from which to create responsibility for the conduct of another." He asserts there was no evidence that he and the co-defendant acted with the intent to promote or assist the other in a knowing killing of the victims. The State argues that the evidence provided the proper basis for the trial court to instruct the jury on the theory of criminal responsibility.

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2).

During discussion about the jury charge, defense counsel objected to the trial court's giving a charge on criminal responsibility for the conduct of another. Counsel explained:

> If it applies at all in this case, I don't think there's any underlying felony for them to be responsible for. I mean, a typical criminal responsibility situation is where a couple of guys decide to rob a store, and one of them is participating, and they both have the intent to participate, and one guy shoots someone, and so the other guy is responsible. There's no criminal responsibility now. There's no underlying felony to argue. Murder second is a knowing crime. You have to have intent for criminal responsibility. I just think it's inappropriate on both of those levels.
>
> . . . .

. . . I don't think that you could argue that one guy is criminally responsible for the actions of another guy in a chaotic melee in a bar.

The trial court overruled the defendant's objection and gave the jury charge on criminal responsibility.

The defendant's argument on appeal is the same. He asserts that "there [was] no underlying felony from which to create responsibility for the conduct of another"and that instead of an underlying criminal endeavor, here, there were individuals in a bar with no apparent criminal intent, a fight broke out, and the parties all acted out of self interest. The defendant's analogy above regarding a robbery situation suggests his argument regards the natural and probable consequences rule.[4] However, that rule does not apply to every case in which the issue of criminal responsibility may be relevant. This court has determined that the rule does not apply when the crime of which the defendant was convicted was the target crime itself and not some unintended collateral crime. State v. Daniel Wade Wilson, No. E2000-01885-CCA-R3-CD, 2001 WL 872442, at *16 (Tenn. Crim. App. Aug. 2, 2001), perm. to appeal denied (Tenn. Mar. 11, 2002). Moreover, the defendant, although citing general law regarding jury charges and the theory of criminal responsibility, has failed to provide any authority for his proposition that there had to be an underlying felony to support an instruction on the theory of criminal responsibility.

In any event, the theory of criminal responsibility was fairly raised by the proof and the trial court did not err in giving the instruction to the jury. The testimony of the State's witnesses pointed toward the defendant as the gunman; whereas, the defendant's witnesses pointed toward the co-defendant as the gunman. However, the majority of the witnesses placed the defendant and co-defendant together inside the club involved in the initial altercation and thrown out of the club together. Some witnesses reported that the defendant and co-defendant left together after Samuel was shot. One witness identified the defendant as the one who shot Samuel outside, but said the co-defendant picked up the gun and the two ran off together followed by Carlmarlos who was found dead behind the club. One of the defendant's own witnesses said that the defendant "wasn't far behind" the co-defendant when the co-defendant approached Samuel with a gun.

Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. State v. Caldwell, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Moreover, it was the province of the jury, as the trier of fact, to determine which parts of the witnesses' testimony and evidence to accredit, and the jury is not required to accept or reject, in whole, a witness's account of events. See State v. Bolin, 922 S.W.2d 870, 875 (Tenn. 1996). As such, there was evidence from which the jury could conclude that if the co-defendant was the gunman, the defendant "assisted or promoted" in the shootings. See Tenn. Code

---

[4]The natural and probable consequences rule extends criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime. See State v. Howard, 30 S.W.3d 271, 276 (Tenn. 2000).

Ann. § 39-11-402(2). Furthermore, even if the trial court erred in giving the instruction, such error was harmless because of the wealth of evidence supporting the theory that the defendant himself was the gunman. See Tenn. R. App. P. 36(b).

## III. Sufficiency of the Evidence

The defendant lastly argues that the evidence was insufficient to support his two convictions of second degree murder. He asserts that the State's witnesses who implicated him in Samuel's murder were not unequivocal, that he provided the testimony of two unequivocal eyewitnesses who indicated the co-defendant shot Samuel, and there was no proof that he was involved in the murder of Carlmarlos.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a) ( 2006). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Id.

-11-

§ 39-11-106(a)(20). As mentioned above, a person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

In the light most favorable to the State, the evidence shows that the defendant and co-defendant were involved in a verbal and physical altercation inside RC's Place that ultimately spilled out onto the street in front of the club and resulted in the victims being shot and killed. With regard to Samuel's murder, Melvin Wordlaw testified that he saw a man with dreadlocks, whom he identified as the defendant, approach the fight between the co-defendant and Samuel with a gun, he heard a gunshot, and saw Samuel lying on the ground. Edward Luckett, who acknowledged that he did not actually see anyone discharge a weapon, testified that after he heard gunshots, he saw Samuel's body in the street and a man with dreadlocks, identified as the defendant, standing on the curb near Samuel's body with a gun in his hand. Montrella Hassell, who was unable to positively identify the gunman, testified that he saw a "tall, slim guy" with dreadlocks pull a gun out from under his shirt and shoot Samuel. The other witnesses' descriptions of the defendant at trial established that the defendant had dreadlocks and the co-defendant had been described as the shorter, heavier one. The defendant offered witness testimony that the co-defendant was the gunman, but at least one of those witnesses placed the defendant close by the co-defendant at the time of the shooting.

With regard to Carlmarlos' murder, Wordlaw testified that after Samuel was shot, he saw the man with short hair and the man with dreadlocks run out of sight in the direction of the back of the club. Luckett testified that he saw the defendant run away after Samuel was shot and then heard more gunshots. Hassell testified that after Samuel was shot, the "tall, skinny guy" with dreadlocks dropped the gun, "the short, stocky guy" with short hair picked it up, and the two ran off. As the two men were running away, Carlmarlos walked out the club door, saw Samuel lying on the ground, and ran after the two men. Carlmarlos was found dead behind the club. Lieutenant Miller testified that the co-defendant admitted shooting Carlmarlos. The bullets that killed the victims were of the same caliber and were fired from the same weapon.

Again, any questions concerning the eyewitnesses' identifications were resolved by the jury as the trier of fact. We conclude that the direct and circumstantial evidence was sufficient to sustain the defendant's convictions for second degree murder under either the theory of direct responsibility or criminal responsibility for the co-defendant's actions. See Lemacks, 996 S.W.2d at 171 (holding that the crucial point is all jurors unanimously agreed the defendant was guilty of the single offense charged even if some found criminal responsibility and others based their verdict on direct liability).

**CONCLUSION**

-12-

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE